Good morning, Your Honor. May it please the Court, Greg Garrison on behalf of the Petitioner's Pearson Ward. Your Honor, these cases are related. They were consolidated at the district court level. So what I'd like to do, I know you've read some very extensive briefings, is just go through a few issues that we're concerned about in this case. First of all, as the Court is well aware, the review standard for this is de novo. These were summary judgment motions granted against my client's finding. There were no triable issues, in fact. The main issue here is whether Fourth and Fourteenth Amendment violations happened in the taking of two vessels. The Castle was the name of one vessel, a large party boat, and Neptune's Palace, another vessel of two different boats. No, the pictures that are in the record, it's just... I'm sorry, Your Honor, I couldn't hear you. The pictures of the vessels that are in the record are worthless. Okay. I'm sorry about that. Have you looked at them? I have looked at them, and I didn't know that they were worthless. But I can explain the vessels to you if you want to know what they look like. Well, do you have pictures of what they look like? I did not bring any pictures with us, Your Honor. I didn't know that it was really an issue for the court, but certainly we do... Well, Your Honor, I've dealt with vessels before. Sure. And I just wanted to see what they looked like. So I look in the excerpts and, you know, there's... Sure. It's just like you're looking at shadows. I certainly apologize for that, Your Honor. That's not something that should have been the way it was. And I'm not quite sure where in San Diego they were birthed or where they were... I can explain that to you. That is in the record. There was an area called the AA Anchorage, which was an area... Maybe you've got a picture of it. There's actually a map in the record of where it's located. We can't tell from that map anything either. It's right in front of the Port District over in San Diego Bay. If you know San Diego Bay, Your Honor, it's over in front of the Port District down by the South County area. It's in the middle of the bay. I know where the, I think, the 10th Naval District is. It's right down by there. Yes, sir. It's very, very close to that, right down by there. It's down south of the Coronado Bridge in the area where they... South of the Coronado Bridge. Yes, sir. South of the Coronado Bridge, if you know San Diego, it would be essentially... Where the destroyer base used to be. That's before my time, Your Honor. I don't know where the destroyer base was. I'm sorry. But there's now a big, large naval shipyard down there. And it's down south of San Diego Bay. And it's down where there's a large shipyard kind of directly almost across from the Coronado Cays, if you know where the Cays are on the west of the bay. Well, you know, San Diego Bay there, Point Loma, foot of Broadway, a lot of history there. Yes, sir. And I shipped out from there. I spent about a year and a half in the hospital. And so I know that place pretty well. And Judge Hall's father was an admiral in the Navy. And I'm sure she knows it well. I was a lieutenant. She was a lieutenant in the Navy. And I was a lieutenant in the Marine Corps. And we made a great combination. So, you know, I mean, I like to know these things. Well, the question you're asking, Your Honor, actually is an interesting question because historically these boats have been around since the 80s. And what's happened in San Diego, I don't know when the last time either of you were down there, is it's gotten a lot bigger on the shore and a lot smaller in the water very quickly. In other words, there's less places to put these. At least once a year. Whenever you go across the Coronado Bridge, if you look to your left, you'll see a bunch of boats in the middle of the bay. That's the 888 Anchorage. That's right where it is. It's a big bunch of boats in the middle of the bay. You can see them sitting out there. The Coronado Bridge is that big ugly bridge that goes over. Ugly or pretty, depending on your point of view, but it's the big bridge. They're right in the center of the bay. Yes, sir. They're not tied up to any dock or anything. They're on moorings. Just on moorings on the Anchorage. Yeah. All right, I'll try to visualize it. Well, just to help you, Judge, the castle was one of the boats, and it was essentially a two-story barge which was used to bring people out on. They rented it out for facilities. And the Neptune's Palace boat, the second boat at issue here, actually was used for church services. Pastor Ward is actually in the back of the court. He's the one that the boat was given to, and he brought people out from southern San Diego on small boats to have church services on this Neptune's Palace. That's what it was for. Did they ever take these boats out of the bay? No, ma'am. What they were intended for, Your Honor, was this. They were there full time, and they were, in order to move them, you had to have outriggers on the outside because they were very large, and they were intended to hold a large number of people and to give people access to the bay that otherwise they wouldn't have had because a lot of people don't have the ability to go out in boats and use it, and that was the purpose of the whole thing. So as a result, that's one of the issues that actually comes up, Your Honor, is that these boats have to be kept in San Diego Bay or moved under very special circumstances because of the way they were built. And they were built back in the 80s to this extent. What happened is the castle was seized on January 22nd of 2002. The Toronto Ferry doesn't run anymore? Still does. Still does. I think, you know, if you want a little sea experience. Well, you know what? I was on it last week, and it's $9 across the bay, so that's a very little sea experience for $9. But the point is things have changed on there a bit. You don't get much for $9. That's true. You get a three-minute ride across the bay. Yeah. What happened in this case, Judge, and the due process issues I want to go over, it's been extensively briefed, but I just want to talk to you about a couple things. There's a long history of problems between the Port District and these boats. It's been documented for years. There's been lawsuits previously because what happened is as San Diego got smaller, people didn't want those boats in the water because they're very big and visual. You can see them. It's just that simple. The rule that was used to seize the castle was Unified Port District Code Section 4.35. That code section says that the sole remedy to be used to seize a vessel is an injunction. That code section was amended, according to the court, shortly before the castle was seized to allow a different code section, 8.25, to allow an inbound. Your Honor, the court argued to the district court judge that that allowed them to have the due process right to take these vessels, to take the castle specifically. On the record, page 368 in Volume 3, there is a proposal to amend the original section which was used to take the boat, 4.35, from the chief of the Unified Port District three years after the taking. And I'm reading to you directly what she says to the Board of Supervisors of the Port. The proposed amendment of this section will allow the harbor police to impound vehicles for violation of this section pursuant to 8.25. Now, here's the point, Judge. They're trying to argue to the court that they had the right to take this vessel in 2001. Four years later, they're amending the law to give them the right to take the vessel. The point we believe is they didn't have the right to take the vessel under that code section in that timeframe. Secondly, Your Honor, if they did have the right to take the vessel, the next code section that becomes operative is 8.25 of the Port code section. And what the district court found is this. The district court found that 8.25 of the Port code section, subsection 4, states that if you can't find the owner of a vessel, and the exact language used is the owner cannot be found or refuses to pay fines and impound fees, then you have the right to seize the vessel and take it. First of all, Your Honor, there is a long history between these parties involving several lawsuits and all kinds of things. Everybody knew the situation with the boat. But that aside, and that's in the record, but that aside, the same section that the court relied upon in finding this was a valid seizure, 8.25, has a fifth section, 8.25, section 5. And what that says is that harbors and navigations code section 500 shall, the word is shall, apply to the disposition of vessels registered with the DMV. There is no argument that my client's boats were registered with the DMV, no argument at all. And as a result, my client was entitled to the boat lien provisions of the harbor and the navigations code to be enforced against him before the vessel was impounded and destroyed. It's undisputed that didn't happen. If you look at record page 354 and 356, you will see that the vessel hassle is registered. It's undisputed fact. If it's registered and you're going to use 8.25 and you have to use the entire code section, which means we were entitled to notice we didn't get due process violation. They took the boat. They wanted it gone. They destroyed it. In regard to the Neptune's Palace, Your Honor, that's the next boat that was taken. And that boat was taken later. And in regard to that boat, Mr. Morgan, who owned the boat, had given that boat to Pastor Ward and his church to use for church services. The problems between that boat and the port district continued. And what the Ward case involves, which was consolidated with the first case, is it involves the Minnell claim for failure to train. The record clearly lays out evidence that there were officers who were trained to discriminate by the port district at various times. The district court found that as a matter of law. You didn't say who were trained to discriminate. That's what the record indicates, Your Honor, yes. They were trained to take minorities off beaches at various times because that's not something that the port district wanted. This is back. That was 20 years ago. It was, Your Honor. It's the same officers who were still working in the same location. And there's no evidence in the record that anything that happened 20 years ago has changed. And when you couple that with the fact that these outriggers we talked about earlier, which are required to move the boat, were gone, and there's a declaration before you on page in the Ward file, page 151, is Pastor Ward's declaration where he says he has seen his outriggers were missing. He was told to move the boat. Couldn't move it without the outriggers, as everybody knew, because the boat had been around for a long period of time. He saw himself those outriggers tied up to port property. Doesn't know how they got there. The port disavows ever having taken them, and then the outriggers disappeared. The question for the court is this. There are declarations before you of people that went to church services in Neptune's Palace who said they felt intimidated because of a police boat sitting right off the barge. Those are page 153 through 166 of the Ward record. You also have the outriggers disappearing, and it cannot be moved without the outriggers. You also have, Your Honor, your holdings in Oviatt v. Pierce, Ninth Circuit case, which says that deliberate indifference is a jury question. Not a question to be resolved on summary judgment. And what the court here found was that there was no evidence to support deliberate indifference. Your Honor. Well, there's one position that these vessels didn't belong in this area, in this anchorage. And there's other testimony that they were given permission. Well, Your Honor, certainly that's another one of the many contested issues of fact that we think allows us to go to trial, which is our purpose here. There's a very complicated case. It's been briefed for you. I'd like to say just a couple minutes for rebuttal. But the point is our position is this case should be tried. There's a lot going on here. It's got a long history. These cases should be consolidated and tried, and my clients should have their day in court. What we're saying, Your Honor, is simply that whether we win or lose a trial, these are excellent attorneys. I don't know what's going to happen. But we clearly have a right to a trial under the laws that exist. And I thank you very much for your time, unless you have any additional questions. I'll save my breath for rebuttal. Thank you. Thank you. Good morning. My name is Ellen Miles. I'm a Deputy Port Attorney, and I represent the San Diego Unified Port District. I'm going to address, Your Honors, on the issues relating to Ward and the racial discrimination aspect. If you would like to ask questions of Bill McMinn, my colleague, who's representing us in the Morgan and Pierce matters, you may do so. I was going to confine my arguments to the Equal Protection Claim as well as the Monell Claim. Well, one of the things I'm interested in is the allegation here that we have something akin to an ex post facto type application of 8.25 as amended. All right. Your Honor, the issue with 8.25 is in August of 2000, the AA Anchorage Ordinance regarding permits for the people in the AA was passed. In September of 2001, under an emergency ordinance passed by the Unified Port District, 8.25A was amended to allow that the Harbor Police or another agent of the Port District could impound a vessel on San Diego Bay in violation of any federal, state, or local law. And that supersedes what counsel was talking about with the 2004 amendments. He refers to a statement in the agenda sheet that was written by Chief Betty Calapez, who had arrived at the Port District in 2003. It was a mistake in the agenda sheet. In fact, 8.25A had already been amended in September of 2001, approximately five months before the castle was impounded by the Port District. So it's clear that the Board had passed by emergency resolution, and that requires a two-thirds vote of the whole Board of Port Commissioners, which is made up of seven members, that it is imperative for the public's safety, health, and welfare. And the reason for that was because at the time, in the AA Anchorage, there were over 100 vessels that were either derelict, abandoned, or in unseaworthy condition. Additionally, there was wreckage of other vessels underneath, which was causing problems with navigation. So for those reasons, the Board of Port Commissioners in September of 2001, five months before the castle was impounded by the Port, it was passed by the Board. Okay. Thank you. All right. Well, how did it come about that this mistake was made? Because during the 2004 amendments, there were several different codes that were amended, 4.30, which regulates anchoring in South San Diego Bay, 4.40, which regulates anchoring in North San Diego Bay, where Your Honor was speaking of La Playa, Point Loma area, and then also the 4.35 section, which pertains to Center San Diego Bay. And the thing about the AA Anchorage is it's actually in Center San Diego Bay, even though it's south of the Coronado Bridge. So the reason that she inadvertently thought that it had not been amended is because there was language left in 4.35 that says that an injunction was the only way that you could enforce it. But back in September of 2001, 8.25a had been amended to say that we could use, the court district could use an impound of vessels found in violation of law, because before September of 2001, the court did only, it said we may go and obtain an injunction. And the problem, I think, as Your Honors could see, is that if the court only has the ability to get an injunction to enforce criminal laws, then it would put the court district at a very distinct disadvantage in being able to enforce its anchoring laws relating to illegally anchored vessels all over San Diego Bay, as well as vessels who were causing a hazard to navigation, were floating, were left unattended, and that. One of these vessels, in fact, did break loose, and did it not? Yes, actually, Your Honor. The palace, which is the 120-foot-long nightclub-like structure, did break free in January of 2003. And that was two years after, I'm sorry, one year after the castle had already been impounded. So for a while, the castle and the palace were both in the AA Anchorage, that center San Diego Bay area. Then, during a storm, the palace broke free and sailed down on its own. It does not have any means of propulsion on its own. The outriggers that were around it at some point were used merely to keep it floated. They did not have any means to propel it. They had to pull it with some other type of vessel. But it ended up in south San Diego Bay. South San Diego Bay is part of the environmentally sensitive habitat, which is regulated by not only the port's jurisdiction, but also federal law. There's eelgrass down there in an attempt to try to get it to grow back to help the fish population renew itself. In light of all the pollution from years, decades of different types of activities, that area is a special environmentally sensitive area. Under UPD Section 4.30, all anchoring is prohibited in south San Diego Bay. So when the palace floated down there at the end of January 2003, it was now not in the AA Anchorage anymore, where even if you believe the testimony of a now dead CEO of the port from 1984, that the palace could stay in the AA, that would no longer hold true, because now the palace was down in south San Diego Bay in an environmentally sensitive area. So thereafter, one of the police officers, Sergeant Bird, went to Mr. Morgan, who was the watchman for both the castle and had lived on the palace for a while until he gave it to the church, and said, Who owns the palace now, Mr. Morgan? We need to find out, because it's in an environmentally sensitive area, and we've got to move it out. And he said, Oh, it's Mr. Ward. He owns it. So we got his information, and Officer Bird went down and posted, sent a letter to Pastor Ward and his church saying, You need to move your vessel. And that's what started the saga of the palace and Pastor Ward down in south San Diego Bay. Now, in terms of the ordinance, Section 4.36, which Pastor Ward claims violated his equal protection rights because it discriminated against him, in order to prove an equal protection violation The officer could have gone down there with a tug and put it back and anchored Jay. Well, the problem is, Your Honor, is one, this vessel is huge and extremely heavy, because in addition to the wooden nightclub part with three stories made up of steel and wood, it had a huge steel bottom part that looked kind of like an aquarium with all these windows on it. So it was actually sitting on the bottom of San Diego Bay. It was embedded in the dirt. And the problem is, if we were, if the court were to undertake such a measure, one, if the whole thing fell apart, the court would be liable for that, and also it would be at a huge great expense to the court district. Part of the reason for the A8 Anchorage Ordinance being passed in 2000 and amended as it was in 2004 was to give more responsibility and accountability to people who own vessels in San Diego Bay. Unfortunately, vessels are fun to have and maybe live on and recreate on, but they're also very expensive to upkeep and maintain. And what was happening is people were buying very dilapidated vessels, often at very cheap prices from marinas or people that didn't want to dispose of them properly, and taking them out and either leaving them there or living on them as a form of a residence. And then what would happen is if there was a storm or that a lot of the boats were wood-hulled, they would start decaying. They'd fall apart. They'd drop them, leave them in San Diego Bay, and go get another one for a dollar. So what was happening is the court district was increasingly being called upon, under its duty to keep San Diego Bay free of debris and safe for navigation of all types of ships, to come in, remove these vessels, tow them, store them, and destroy them at great cost to the taxpaying public. When does the Coast Guard get involved? The Coast Guard only gets involved in vessels that have commercial licenses. And actually there was some issue with the palace a long time ago before Pastor Ward got it, and this is in the record, that it was used for parties. And Mr. Morgan would transport people out on whale boats with engines, and they'd go out and have parties on the palace and the castle. The Coast Guard would get involved where it was being used for a commercial-type venture. However, if it was being used recreationally, the Coast Guard would not get involved. And, in fact, part of the whole thing about the San Diego Port District's ability to regulate San Diego Bay is found in the Federal Register, which allows the port to apply its own ordinances to different anchorages, such as the A8 anchorage, the A5 anchorage, which is located in Glorieta Bay in Coronado. That's a short-term anchorage. The A1 anchorage, which is located in La Playa Cove, which is in Point Loma, and a very popular anchorage. And then we have an A3 anchorage at the bottom of Laurel Street that Your Honor mentioned. That is now a mooring ball field. So the Coast Guard really doesn't want to get involved in a lot of these local issues, and the Federal Register has opined that it was in the discretion of the Coast Guard to leave such local anchoring ordinances to the local authority, which would be the San Diego Unified Port District. If I may also, since I'm on the laboring oar of defending the district court's judgment about the deliberate indifference claim, under Monell this failure to train claim came up in the guise of two police officers who are still employed by the Port District, who early in their career alleged racial discrimination within the department. And that occurred from approximately 1986 through 1989. The person that they attribute this discrimination to is now Lieutenant Frankie. Lieutenant Frankie, as is found in his deposition, was hired by the Port in 1981. At most he would have been a sergeant during the time period. That is relevant with these officers' claims. And what they claimed is that the department threw lineups to go and target minorities. That actually somehow caused a constitutional deprivation to Pastor Ward. The problem with that theory is that nothing the officers did to Pastor Ward constituted a constitutional deprivation. The palace was not seized. He was not given a ticket. He was not given a warning. He was not arrested for any other type of violation. I think the record is replete with references by not only the officers involved, like Sergeant Berg trying to get Mr. Ward to move the vessel, but also even Dan Wilkins, the executive vice president. There's quite a bit of testimony from him in the deposition and also a declaration that there were many, many meetings between Pastor Ward and the members of the church about what they could do with Neptune's Palace. So to say that there was some type of a custom or policy of discriminating and targeting people like Pastor Ward just doesn't, there's no causal connection between the two. Further, in terms of the inadequate training, there is no evidence that the training of targeting was perpetrated by any of the officers that were involved with Pastor Ward on a daily basis. Lieutenant Frankie had nothing to do with Pastor Ward or the palace. He was picked out because of the deposition testimony of the harbor police officers that had employment discrimination claims against the court district. And the district court rightfully found also that Lieutenant Frankie, under Propratnick and the other policymaking cases, it's clear that policymaking is defined by state law. Under the Port Act, the Board of Port Commissioners is the official policymaker. Now, I think you could make an argument that for law enforcement purposes, like setting procedures and setting up probable cause to arrest and that type of thing, that the chief of police would be a properly delegated official for that purpose. But Lieutenant Frankie, under no stretch of the imagination, could be considered a policymaker. And finally, in terms of the training, the plaintiffs have pointed to inadequacy because of direction given in informal lineups regarding the training. We're dealing with summary judgment, right? That's correct, Your Honor. Okay. So there's absolutely no issue or disputed issue of material fact? No, Your Honor, there's not. And remember that the material fact has to be genuine. It cannot be made up of corroborating uncorroborated or self-serving testimony. The genuine fact is that there's no causal link between this purported policy if there is one. And I think under the terms of the case law, the policy ---- How about the position that they had permission to use Anchor J? Your Honor, that was in a declaration from James Morgan. And as counsel rightly pointed out, Mr. Morgan and the Port District have had a long history together. He claims, and it was objected to at the summary judgment level, that Don Ney, who was the port director at the time in, I think, 1994, gave him permission. Don Ney, N-A-Y. N-A-Y. Mr. Ney passed away several years ago and before this litigation even started. So it's really rank hearsay. And there's no other corroborating testimony that said that they had permission to anchor any of the vessels. And, in fact, there was a lawsuit. Well, why is it rank hearsay? Because it's an out-of-court statement made for the truth-of-the-matter survey. Well, but the person who made the statement was a person who had the ---- was authorized to speak for the court. Well, no, Your Honor. The way this statement was made in evidence is James Morgan, who has been the litigant before, he's not a policymaker for the court. He's not employed by the court in any manner. He is the one that previously owned the palace before giving it to the church. Yeah, but who ---- He said, Don Ney told me I could stay. Okay. But that's hearsay. Well, would Don Ney be in a position to unilaterally make that determination in any event? No, Your Honor, because, again, it's under the Port Act, it's the Board of Port Commissioners that makes all the policies and also under Section 55 of the Port Act shall make all rules and regulations pertaining ---- I think that's what the district court found. I mean, it could have been the janitor who told him he could stay. A number of people could have told him he could stay. But it didn't have a force in effect because the Port Act says ---- But Ney was in charge, wasn't he? He was the executive officer at the time. He was in charge. He said you can stay there. Well ---- Do you have any more questions, Your Honors, about ---- I'm not so sure that's hearsay. And I'm not so sure that there isn't a speeded fact issue on that. All right. Well, but, again, Your Honor, with respect to that, in terms ---- If it was ---- So what happened to these two ships? Well, the castle was destroyed after the plaintiffs were given the opportunity to come and get the vessel. They just left it there. And in terms of the notice that was given, the ---- Who destroyed it? The Port District did. You mean they sent people out from the Port District? We actually ---- We have a general services department, and they do vessel destruction in-house. Didn't they give them a couple of months? Yes, Your Honor, they did. They didn't come and get the vessel? Nobody showed up?  In fact, Your Honor, there's a letter from me to Mr. Morgan in response to a letter from him about the castle, saying the castle is here at the port. You need to come and pick it up upon proof of proper ownership and also the payment of the lien fees that were incurred for the sewers. Well, the vessel was ---- What was the hull made of, metal? It was a barge. Barge. Right. It was kind of a rectangle, and it had four turrets, and you would walk inside. And I guess in its earlier glory days, it had disco balls and everything. But by the time it was sitting in the A8, the impound report from Officer Martinez ---- Well, what was the vessel constructed of? It was plywood. The whole vessel was plywood? Well, no, there was the understructure was a barge, so that would have been steel. And then there was wood on the top, and it was hammered down, and then there was plywood probably with ---- I'm not a carpenter. But it looked like a rectangle. What was the scrap value? I do not know that, Your Honor. Did it have value? No, Your Honor, it did not. It cost more to destroy it than any value it may have had. There was no salvage value. Was it put up for sale or auction? No, Your Honor, it was not. It was destroyed. Was that required to put it up for sale or auction? No, it's not, Your Honor. Because I handled some of those with ships. One of them was the SS Catalina. And, oh, there were a lot of bidders on that, and mainly people who were scrap metal dealers. Well, Your Honor, there was not a lien sale. It was destroyed. But this deal has gone way up. It has. Yeah. But this was also in 2001. But, Your Honor, let me get back real quick about the issue of the Don May suggestion that they could stay anchored there. Even if you assume that was true and it was an admission of a policymaker, that was so they could stay around the A8 anchorage. It's a matter of undisputed fact that when the palace broke away from the A8, it was down in a sensitive area. It was also true that at that time, in 2000, way after Don May's tenure was over, that the Board of Port Commissioners, the ultimate policymaker. Was the Board of Port Commissioners aware that it had broken loose from the anchorage? I believe so because I believe that Pastor Ward may have come to a board meeting to ask the board to be able to stay down where it was. I mean, you saw that there was a storm. It's hard for me to imagine a storm in San Diego Bay. Well, apparently, the way it works is because it goes from north to south. When storms come up, it actually pushes, the fetch pushes stuff down. Yeah, but someone must have seen it when it broke loose. Your Honor, there were no witnesses. All we knew was that all of a sudden there was this huge structure down in south San Diego Bay, and it was easy to see it because there's no board structure down there. The port doesn't patrol? Yes, the port does, and that's how they found it down there in the first place after it broke free. It basically ran aground. Correct, and it did run aground. What was the distance between the anchorage? Okay, the A8 is up between the border of National City and Chula Vista, and it ended up still in the city of Chula Vista, just a little bit west of the J Street Marina, so I would say maybe a mile, not very far. But the thing is, is down in south San Diego Bay, it's really, really shallow, and that's another reason why it's environmentally sensitive, and people are not allowed to go any faster than five miles an hour in that area, and that's why there's absolutely no anchoring allowed there, because it's just too sensitive of an area. But I would like to get back to, does anyone have any further questions? I think you're beyond your time. Oh, I'm sorry, Your Honor. Yeah. Like six minutes beyond your time. Yeah, six minutes beyond your time, yeah. Thank you. That's a big offense. Go ahead. All right. What do you got left? Just a couple things, Your Honor. First of all, on the Don Ney declarations, there's been some statements that aren't contained in the record, and I want to go back to what is in the record. You've only got one minute now. I got three. You're right. Now I got 2.59. What the facts are, Your Honor, is there was a lawsuit under the old section, and there was an injunction against the palace by the port, because there was evidence of where it could and couldn't be. There was a meeting, according to the declaration, between Mr. Morgan and the man who ran the port, and they came to an agreement. What we know for a fact is after this agreement, the lawsuit was dismissed. So to say that it's hearsay clearly is not supported, and there's no evidence in the record that shows why this happened. But right after the lawsuit is dismissed, the boat's allowed to stay where it did stay for a long time. I want to raise just a couple of issues quickly. In regard to the palace with Pastor Ward, what happened, Your Honor, is this. That boat cannot be moved without those outriggers. It simply will tip. Those outriggers are necessary to move it. And he was working with the port and trying to come to a resolution as to where that boat could go. Well, it did move. No, it broke away or was let loose, one of the two. It cannot be moved. No, but it didn't tip over. You're right. It cannot. According to the people that built it, it cannot be moved safely. I can just say that, Your Honor. It can't be towed. Well, I don't think it was safe. It seems to me like it was incredibly dangerous to have something of that size floating around San Diego Bay with no evidence of propulsion, nobody at the helm. I think just kind of wherever it lands, it lands. Wow. But that's not the way it worked, Judge. The way it worked was that it was tied to a mooring and then people came out to it as a floating location. No, I understand that. But when it broke away. In the storm. Sure. In the storm. It was incredibly dangerous. I don't think anybody's going to argue with you there. And then it's run aground someplace and who knows if it can break away again or what can happen. It's there. Well, it couldn't break away again because it was stuck, and that was the problem. It was stuck in the mud. As Ms. Miles has told you, we don't disagree with that fact. Once it broke away and once he couldn't move it with the outriggers and get it someplace where he could keep it, when it lodged in San Diego Bay, it became a liability. There's no question about that. What we're talking about is what happened before then and we're talking about whether those outriggers were necessary to move it. They didn't seize it. They didn't seize it until after it was. Like two years after. So it had been stuck on the bottom of the bay and there's problems with, you know, a boat sitting in dirt doesn't work after a while. It starts to rust in or out. I don't know the specifics, but the point is once you get a boat run aground, it's not the same boat as it was before. I'm sure that's right. Yeah. And that's the issue with that one. I want to briefly just go back to the issue on the 825 issue. 436 was amended, which was a specific code section to deal with the A8 anchorage in 2001 to allow things to happen within 825. 425 is a different code section that was used to seize the castle. With 425, it says the only remedy available is an injunction, which is exactly what it says. Thereafter, they're trying to say because they amended 436 and tried to expand this 825 code section, despite the fact that 425 says injunction is the only remedy, these competing laws allowed them to take an impounded boat. Well, they said that pursuant to, and I think the district court found that pursuant to 825 they had the authority to do it. Well, the court did find pursuant to 825 they had the authority to do it. The 825 had in fact been amended prior to this time. 825 was amended only in connection with 436. It's in the record there. And what happened was it was amended to say that we're going to have the right to do various things. And as we've argued in our paper, the bottom line, judges, now you have two codes on the book that absolutely conflict with each other. That's the first problem. Secondly, because 425 was never amended. It still said our only remedy under 435 is an injunction, which is what they seized the boat under. They seized it under 435. If you seize it under 435 and the only remedy is an injunction, then that's your remedy. To go and say that, gee, now we've changed something else so we can backdoor into this isn't true. And not only that, Your Honor, it's not what their policy and procedure was. And I would ask you to look at the code section on page 368. Counsel, my understanding is that their contention at the district court was that they didn't seize it, just pursue it to 435. That is incorrect, Your Honor. They seized it. It's in the record. I'll relook at the record. Yeah, because that wasn't my understanding. I thought they relied on it. And, Your Honor, I can cite you to the page 356, shows the seizure notice. They seized it under 435 of the record. And thereafter, they seized it under 435. So what I'm just trying to mention, Your Honor, is if you look at page 368, the reason they had to amend 435 is because it was incorrect. I'm over my time. I don't want to go further unless you have questions. Thank you for your patience. Good argument. Thank you for your patience. Excellent. All right. The matter is submitted. Martha, can we get some air conditioning in here? It's getting warm up here. It's very warm, yeah. I thought it was me. No. Well, we've got the windows open, two or three. We'll close the windows. It's a little dark in here anyway. Yeah. It's just the air conditioning. We'll get the air on. Yeah. It's just, it's in here. It's cold in here. We'll put you down as making an appearance before the 9th Circuit. Thank you, Your Honor. Did you live in the corner? No. Where did you live? In the streets all over. Oh, you lived in the waves there. No, I lived as a child. Oh, as a child. Yeah. Were you in the Navy? I was in the Navy. I thought you were in the Navy. I thought you were in the Navy. I'm sure my parents were there that long. Yeah. My father's been there. My father and mother have been there. Oh, it's a beautiful place. It's a beautiful place. That's where a lot of Ferguson's family lives. Oh, sure. That's a good lawn. Look at that. Jesus. I used to go over there and go down the foot of Broadway until 5 o'clock. Okay, now we come to Curry v. Lardner.
judges: Pregerson, Hall, Ezra